This is an appeal from a judgment against the partnership known as the Mansfield Milling Company, W. T. Hudson and E. R Holland, as trustees, and W. T. Hudson and E. R. Holland individually, and in favor of Williams Patent Crusher Pulverizer Company, hereinafter called plaintiff, in the sum of $803.53, and costs of court.
The evidence shows that some time in September, 1920, the Mansfield Milling Company, hereinafter called defendant, became interested in purchasing a grinder or mill for grinding stock feed. Representatives of the company visited a mill in Fort Worth where there was one of the grinders sold by the plaintiff company, and saw it work. Roy Owens, the agent for the plaintiff company, went to Mansfield to see the defendant company with reference to selling them a grinder, and was probably with the representatives of the defendant company when they visited the mill at Fort Worth where the plaintiff company's grinder was in operation. The plaintiff company sent to the defendant company an offer which contained the following statements:
"We hereby propose to furnish you, f. o. b. St. Louis, Mo., on trial, 1 Williams miller B screening and all around feed grinder of the following dimensions: With one-sixteenth and one-eighth perforated cages, also never slip pulley, with fan collector and 30 feet of piping, metal catcher, for the price of twelve hundred and fifty and no/100O dollars ($1,250.00) to be paid as follows: One-fourth by sight draft attached to bill of lading covering the shipment. Remainder as follows: One-fourth 3 mo., one-fourth 6 mo., one-fourth 9 mo., at 7 per cent.
"We guarantee the said machine to be manufactured in a workmanlike manner. The above proposition is made upon the following conditions:
"By the acceptance or this proposition you agree that, within reasonable days after you have received the machinery, you will install the same in your plant located at Mansfield in the state of Texas, according to your instructions, upon a proper foundation to be provided by you; that you will operate the machine according to our instructions and at a speed under load of 2,800 R. P. M. as per No. 5 on the other side, for a period of 15 consecutive days immediately following said period allowed for installation; that if the said machine should not crush 1,200 to 1,500 pounds an hour of screenings and bran through a one-sixteenth cage and 1,500 to 2,000 pounds an hour through a one-eighth cage, when so operated, you will immediately notify us of the fact, and we are to have the privilege of making changes in the machine, if we desire, forwarding any substituted or additional parts to you, upon which we are to pay the freight. After completion of the changes, if any are made by us, you are to have a further period of 10 days to try the machine. Should the same not have the capacity to crush to the fineness mentioned above, you are to have the right to reject the machine, providing that on or before the day of expiration of the first trial period above named, or in the event of changes by us, then, on or before the day of expiration of the said additional period above named, you notify us in writing of such rejection, and place the machine and all appliances furnished you therewith on board car at your station in as good condition as when received by you, less natural wear and tear, but not excepting damages by fire or the elements, billing the machine to us, forwarding the bill of lading and we paying freight charges both ways; otherwise the machine is to be considered accepted. Upon rejection and return of the machine within the time and manner aforesaid, we will refund any advance payments made by you upon the purchase price.
"Title to the machinery shall remain in us during the trial period. Upon acceptance of the machinery by you, you are to secure the deferred payments by chattel mortgage, conditional sale contract, lease or other instrument which, under the laws of your state, will secure us in a lien on said machinery for such deferred payments. The attaching of the machinery to your plant or realty shall not be considered as a waiver of title to the machinery by us. * * *
"All expense in preparing for the installation of the machine and incident to its installation or operation shall be borne by you. The trial period shall not be extended except by agreement in writing. It is understood that there are no guaranties or warranties, express or implied, except the particular guaranty hereinabove made. The machine is to be shipped in about 20 days after receipt by us of your acceptance of this proposition, unless we should be delayed by strikes, breakdowns, fire, or other unforeseen causes.
"It would be more economical for you to have the machinery installed by one of our milling engineers who is familiar with this class of work, and who can start the machine and show your man how it should be operated. We also offer to furnish such an engineer if you desire, upon payment by you for his time and expenses, the time to be charged for at the rate of $_____ per day. * * *
"We hereby accept the foregoing proposition of sale this 10/5/20/1921, and agree to fulfill the terms thereof. We do not desire the services of your engineer for installation of the machinery on the terms above proposed.
"[Signed] Mansfield Milling Co.
"By E. R. Holland."
On December 8, 1920, the grinder was installed in defendant company's plant; the defendant company having returned the one-sixteenth inch sieve in exchange for the one-fourth inch. On October 16, 1920, the defendant company executed two notes of $416 each, one payable in 90 days and the other in 8 months after date, for the grinder. The defendant company had more or less trouble in getting the machine to operate properly and to grind the amount of feed per hour which it *Page 345 
was supposed and had been represented by the defendant company to grind. Letters and telegrams were exchanged by the parties, and apparently the plaintiff in good faith was exercising its efforts to make the machine do good work, and the defendant company in good faith was doing all in its power to follow the directions and suggestions made by plaintiffs. On February 16, 1921, the defendant wrote to plaintiff the following letter:
"Williams Pat. C. P. Co., St. Louis, Mo. — Gentlemen: We note that our paper has been sent to First National Bank, Mansfield, Tex., for collection, and the same is now due.
"Can we arrange with you to get some extension on this note, as we are not in a position to meet it just at this time, but have the machine in operation and will be able to make the payment in sixty to ninety days, and possibly before.
"As you already know, we had a world of trouble with the machine in the way of hot bearings, having lost as much in time and money as the note amounts to, and have only had it in successful operation the past two weeks, which does not give us time to make anything toward paying the note.
"We regret to ask this favor of you, but, if you can help us out in the way of a sixty to ninety day extension, we feel that we will be in a position to meet the notes, and shall be glad to hear from you at once relative to the matter.
"Yours very truly,
"Mansfield Milling Company."
On June 9, 1921, the defendant company wrote plaintiff this letter:
"Williams Pat. C. P. Co., St. Louis, Mo. — Gentlemen: We regret very much to be forced to return unpaid the note due recently, but we are barely paying expenses, and, unless times get better, we know of nothing to do but make shipment of your machine back to you.
"There is scarcely a shipment that we have bought of all wheat or feeds that have not gone down in price before we would sell it out, and business and sales have not been up to standard. We incurred a great expense before we ever got the machine going, and, when we finally did so, we had a down market to fight and we have not made a dime.
"We do not want to be locked up on account of this note, but have done the best we could, and, if it will in any way help you, will arrange to return the machine, and repurchase when times get better, or will try and arrange with the shareholders to pay at the rate of $50.00 per month by way of assessment. We regret very much that circumstances over which we have no control causes us to write a letter like this, and realize that we made a mistake in buying at the time, but we had hopes of doing a great business, as have usually done.
"Will be glad to have you advise us what we are to do.
"Yours very truly,
"Mansfield Milling Company,
"By W. T. Hudson, Prest."
On June 16, 1921, the defendant company wrote plaintiff, inclosing a check for $57.28. The $50 was to apply on the principal and the $7.28 on interest. The letter contained the following statement:
"We very much appreciate your leniency in this matter in helping us over a rough place, and will arrange to send you the $50.00 on the 15th of each month until business gets normal, at which time we will pay the balance due."
In June, 1921, the plaintiff company placed in the hands of an attorney at Fort Worth the notes given by the defendant company, and the renewal notes were finally executed, dated June 25, 1921; some 30 days having elapsed from the date of the notes to their execution. Defendant also executed a chattel mortgage on the machine. Some time in October, while the grinder was grinding some ear corn, or snap corn as it is called in the statement of facts, the casing holding the cylinder broke and allowed the bosing to come apart and the cylinder fell out and was broken up into a number of pieces. No one was in the room where the grinder was at the time of the accident; W. E. Lamb, who seems to have been manager of the mill, being in another room at the time. Mr. Lamb testified that after the accident he examined the broken parts of the machine and from his examination he believed that a flaw in this casing was the direct cause of the accident. He testified:
"I saw this mill immediately after it broke and went to pieces. I made an examination of the mill and parts there to ascertain what was the cause of its breaking and going to pieces. I put in quite a lot of time looking it over. From the result of my examination I believe that flaw was the direct cause of the mill breaking. It showed weakness at that place. We had this man down from the Fort Worth Mechanical Company to assist in making the mill do the work, and we had Mr. Hudson and Mr. Graves. This mechanic from the Fort Worth Mechanical Company run the bearings and put them in and pronounced the bearings in first class shape again. This flaw was in the lower casing and the break showed a portion of the lower part broke off with the cap of the bearing. As to how large that casing is, the lower portion is the complete base of the mill and it comes up about five-eighth inch thick around the lower part of the bearing. It was the bearing pedestal. A portion of it came off with the stud bolt. It did not break through the hole the stud bolt goes through. A portion of the stud bolt comes off with it. There is a piece of it there with this bolt. The cap was fastened to the base of the mill. The base was about 20 inches high, or something like that, and with the length of the cylinder. It was longer that way than it was the other. It was quite a large casing. As to how big a spot there was of dross metal, it was more or less in circular form and one and one-fourth inches across, but not as wide as long. With reference to the surface, it was on the opposite side from where the belt was. For instance, if the pulley was here, and the belt come from that direction, it was on this side, opposite side from the pulley and belt. We run *Page 346 
that belt only tight enough to prevent slipping. One man could take the belt off and on the pulley. The belt was about 19 or 20 feet long and the drive pulley was 6 feet and the drive pulley on the mill was 10, close to 50 feet of belt in all."
No effort was made by the defendant company to repair the grinder, and no application was made to plaintiff to have the same repaired. When suit was filed by the plaintiff, the defendant answered, setting up the trouble it had had with the operation of the grinder, alleging that certain defects in the construction of the grinder rendered it unfit for doing the work for which it had been mutually agreed it would be required to do in the defendant's mill, and praying, by way of cross-action, for recovery of the amount the defendant had paid on the machine.
The cause was submitted to a jury on special issues, and the jury found: (1) That the machine in question was installed according to the directions; (2) that the defendant did not state to plaintiff before the signing of the contract of purchase that the said machine would be used to grind snap corn; (3) that the machine was not worthless for the purpose for which the jury found it was mutually understood by the parties to the contract that same was sold to defendant; (4) that plaintiff's agent did not represent to defendant just prior to and up to the execution of the renewal notes sued on and after February 22, 1921, that the plaintiff would make the machine do the capacity work it was represented to do. The court entered a judgment for plaintiff on the issues as answered by the jury, and defendant has appealed.
Appellant complains of the refusal of the court to give certain issues tendered, which issues in our opinion were merely evidentiary of the facts sought to be established. For instance, one is:
"Did the defendant from time to time complain that the mill was not functioning as the plaintiff warranted it would?"
In the first place, it was not denied by the appellee that appellant had made a great many complaints of the mill not doing the work it was supposed to do and as advertised to do. In the second place, if the jury had found that the defendant had made numerous complaints of the failure of the mill to function as plaintiff warranted it would, this would have been but evidentiary of notice to the plaintiff of that fact. The main fact sought to be proved was, Did the machine do the work it was warranted to dot The evidence as to the communications between plaintiff and defendant was by telegrams and letters, about which there could be no question as to their purport and meaning. We do not think that any error is shown in the refusal of the court to submit these issues tendered.
One of the notes given by the defendant to the plaintiff was dated February 15, 1921, and we suppose was signed about February 22, inasmuch as the court in submitting the issue marked No. 4 hereinabove mentions that date as the beginning of the period in which the representations of the plaintiff's agent to defendant might have been made.
Other assignments of error complain of the failure of the trial court to submit issues as to whether the plaintiff knew that the machine was to be used primarily for grinding snap corn, and whether the machine was worthless for that purpose. The written contract executed by defendant is in the record, and we have examined it and all of the letters and communications from plaintiff to defendant, and find no statement that the mill would grind ear corn or snap corn, or any reference to snap corn, in any of the communications or the contract. Mr. Hudson testified that the agent told him that the mill would grind snap corn. The agent denied this. But we think it is immaterial under the record disclosed as to whether the agent stated this or not, and whether the machine was capacitated to grind snap corn. The contract provided for a period of trial and test, and more than 8 months had elapsed when the defendant executed the renewal notes and the chattel mortgage, and no limitation or stipulation was made by the defendant as to the agreement and promise therein made.
In Bonham Cotton Press Co. v. McKellar, 86 Tex. 694, 26 S.W. 1056, Judge Gaines, of the Supreme Court, said:
"In regard to the second question, it may be conceded that when the seller of machinery warrants its quality and capacity, and the contract provides that, before the purchaser shall be bound, the machinery shall be put in operation and tested, and when the test has been fairly made, and the purchaser has accepted the property, he can no longer claim damages, either in an action by him, or by way of recoupment of the purchase money for a breach of the warranty."
In J. I. Case Threshing Machine Co. v. Manes, 254 S.W. 929, the Commission of Appeals held that the purchaser of an automobile had waived his right to rescind, where he had used the car from March until the following January, without giving notice of any breach of warranty, or giving the seller an opportunity to comply with the warranty. While in the instant case the defendant did give the plaintiff at various times notice of the failure of the machine to do the work it was warranted to do, yet the defendant signed the renewal notes some 8 months after the machine had been purchased, and some 30 days after such notes had been executed, during most of which time the defendant had the notes in Mansfield awaiting their signature, and at this time the defendant did not express any desire to rescind the contract theretofore made, nor was there provided in the notes then signed, or in the chattel mortgage then given, any provision for any *Page 347 
further tests of the machine. We believe that under such circumstances the defendant has waived any right of rescission. See Cameron Steam Pump Works v. Lubbock Light Ice Co. (Tex.Civ.App.) 167 S.W. 256; Board v. Emerson-Brantingham Implement Co. (Tex.Civ.App.) 203 S.W. 421.
We have examined all of appellant's assignments and propositions thereunder, and find none that in our opinion should be sustained The defendant company is evidently composed of honest business men, anxious to do the right thing in their dealings, but, apparently, if they had any rights of rescission, or any rights arising out of the failure of any warranties made by the plaintiff, they have waived such rights.
Therefore the judgment of the trial court is in all things affirmed.